[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: COMPLAINT FOR DISSOLUTION OF MARRIAGE
CT Page 1331-H
The plaintiff wife commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown. The writ and complaint were returnable to this court on July 20, 1993. Thereby, the plaintiff also sought custody and support of the minor child, alimony, an equitable division of the parties' property, and other equitable relief The defendant husband filed an answer admitting the allegations of the complaint, and thereby submitted to the jurisdiction of this court. The defendant also filed a cross complaint seeking a dissolution of the marriage, custody and support of the minor child, alimony, an equitable division of the parties' property, attorney's fees, and other equitable relief.
Each party was represented by counsel at trial. Each party testified, and submitted financial affidavits, documentary evidence, and proposed orders for the consideration of the court. Only the defendant submitted a child support guidelines worksheet for the court's attention.
On November 21, 1995, during the course of the trial, the parties agreed that certain orders should be entered concerning the minor child. These included joint legal custody, with the plaintiff maintaining the child's primary residence. The defendant would have visitation scheduled on Wednesday afternoons from 5:00 pm to 7:00 pm, extended to 8:30 pm if no school was scheduled for the following day. Holiday visitations were to take place as follows: Thanksgiving — in even numbered years the defendant should have the child from Wednesday evening preceding Thanksgiving until 6:00 pm on the following Sunday. Christmas — every year the plaintiff should have the child with her on Christmas eve until 11:00 am of Christmas morning, with the defendant having the child for the balance of Christmas day. The child should spend the first half of each Christmas vacation with the plaintiff, and the second half with the defendant. Mid-SchoolVacations — The parties should alternate care of the minor child for the February and April school vacations; and, in the event there is only one such vacation scheduled for any school year, that too should be alternated. Summer vacations — Each party should be entitled to two uninterrupted weeks of summer vacation with the minor child, with each vacation week to commence on a Friday and end on a Sunday. The court has incorporated these agreements into its memorandum of decision. CT Page 1331-I
The court had invited the parties to submit briefs addressing paragraph 4j. of the defendant's proposed custody agreement, submitted under date of November 21, 1995. This proposal requested the court to order that "[t]he mother shall not move to other than Hartford or Litchfield counties without giving the father written notice of the move so that the child's best interest concerning contact with both parents may be addressed by the court." Neither party provided the court with written arguments on this issue.
 I
From the evidence presented, the court finds as follows:
The plaintiff, Anna R. Caron, was married to the defendant, Robert Caron, in New Britain, Connecticut on July 12, 1975. The parties have one child, born to them during the course of the marriage, Nathan Caron (born March 27, 1985). The plaintiff is a life-long resident of the state of Connecticut. Neither party, nor the child, has been the recipient of public assistance.
The plaintiff, who is forty-seven years old, has pursued a successful career as a teacher of science and technology in the Newington public school system: she has taught anatomy, physiology, biology, computer science and other courses at the middle school, junior high school and high school level for twenty-six years. The plaintiff received an undergraduate degree in biology from the institution now known as Central Connecticut State University. During the course of this marriage, the plaintiff has also earned a masters degree in special education, and her "sixth year" certificate in education. The defendant did not contribute support, financial or otherwise, to these academic endeavors pursued by the plaintiff.
The plaintiff currently earns gross wages of approximately $62,000.00 per year. Because of the longevity of her employment, she will not likely receive salary increases in the future, although she intends to remain at her current job until Nathan reaches majority age. The plaintiff does not participate in the Social Security System, due the nature of her employment. In lieu thereof, she makes regular contributions to the State Teacher's Retirement fund. The defendant did not contest the plaintiff's financial affidavit which submitted, at the time of trial, that those contributions were worth "$70,500+". In 1992, prior to the commencement of this litigation, the plaintiff began purchase of CT Page 1331-J an annuity plan sponsored by the Aetna. At the time of trial, including contributions made during 1993 and 1994 when this action was pending, that annuity plan was valued at $22,550.00. The defendant raised no contest to the valuation of this annuity.
The defendant is nearly forty-nine years old. He served with the United States Air Force from 1967 through 1971. He was employed at Dunham Bush when the parties met, but was subject to frequent lay-offs at that job. The defendant has had various periods of employment and unemployment throughout the marriage. His only full time, continuous employment was at Colt's, where he started work in approximately 1980 and stopped in 1982. He did not earn income from work outside the home on a regular basis from 1982 until the commencement of this litigation, when the plaintiff told him to find work.
Very recently, the defendant obtained employment. He is currently working twenty to twenty-five hours a week at Stop and Shop. He is also currently working eight to fifteen hours a week at the United States Post Office, sorting and delivering mail in Avon, Connecticut. The defendant hopes to obtain full time employment with the post office. He currently earns total gross wages of $21,146.32.
The defendant took college classes from 1975 through 1984. He received tuition and support stipends through the GI bill while so engaged. Thereafter, the defendant received a B.S. degree in Industrial Technology from Central Connecticut State University. The defendant is well above average in intelligence, and excels in mathematics and electronics. The defendant can be very charming in public settings, such as trade shows. However, he has not been industrious or diligent in securing employment in any occupation which would make use of his education and training. The defendant has had an injury to his lower back, for which he has sought. but did not receive, disability benefits. Notwithstanding this condition, he is able to play golf once a week, pulling a cart to transport golf clubs during this activity.
In 1981, the plaintiff and the defendant constructed their current homestead at 56 Duane Lane in Burlington, Connecticut. Both parties contributed physical labor to the construction. The plaintiff was responsible for choosing the design of the home, and for dealing with sub-contractors who worked on the project. CT Page 1331-K
For the great part of their marriage, the defendant dominated the plaintiff physically, emotionally, and financially. The defendant has a history of alcohol abuse and a propensity to attempt to use physical and verbal violence as a means of resolving disputes and to assert himself. The defendant abused alcohol from the start of the marriage through 1984.[1] During this time, the defendant assaulted the plaintiff and the family dog, threw furniture and threatened the plaintiff, and exposed her to repeated episodes of verbal abuse. The defendant continues to have aberrant and offensive verbal outbursts that have been displayed at home, in public, and in the presence of the parties' minor child.[2] The defendant has regularly subjected the plaintiff to unwanted sexual activity, including rectal penetration notwithstanding her complaints of painful fissures in this orifice. All of this unpredictable behavior has caused the plaintiff to live in dread of the defendant, his temper and resultant rage.
The plaintiff desired to bear children during the marriage. She hoped to care for her children at home, supported by her husband's anticipated income, and developing a small business called The Bead Basket. These hopes were never realized. Conception was avoided from 1975 through 1983 because of the defendant's problem with alcohol consumption, and because of the desire to achieve a financial status that would avoid the need to place an infant in day care. The plaintiff experienced five miscarriages. The defendant was not supportive during these events, and failed to assist in such modest tasks as providing the plaintiff with transportation to doctor's appointments.
After their child Nathan was born, the plaintiff observed ten weeks of maternity leave, then returned to teaching full time. Her work schedule required her to be absent from the home from 6:15 am until 4:00 pm on school days. The defendant, who was available to provide daily care for the child in the parties' home, instead arranged to have Nathan brought to day care. Even when Nathan started school, he was cared for in an after-school program, not by the defendant. The defendant has contributed to the care of this child care by awakening him, providing breakfast, and assisting him in getting off to school on week days. The plaintiff has performed all other child care obligations, including but not limited to laundry, medical supervision, and arranging school, summer and social activities.
Nathan suffers from hyperactivity, which was diagnosed before CT Page 1331-L he started elementary school. The defendant has not cooperated with the plaintiff's efforts to create an effective home-school-physician support system for Nathan. Despite his availability, the defendant has been desultory in his attendance at meetings held with the child's educational consultant, psychiatrist, or at school. The child is maintained on Ritalin, but the defendant has failed to meet the child's needs by appropriately supervising his medication intake. No evidence was presented to explain the defendant's lack of attention to his son or the challenges this child faces.
For a number of years, the defendant has taken Nathan on a one-week summer. camping trip. The child reportedly enjoys these excursions with his father.
During the course of the marriage, until after the plaintiff consulted an attorney in 1993, the defendant maintained absolute control over the parties' finances. The defendant would take the plaintiff's paycheck, pay the household bills, and otherwise use these earnings as he choose. The defendant rigorously supervised the plaintiff's shopping trips for the family's foodstuffs and Nathan's clothing: the resulting purchases were most modest in quality and quantity. However, the defendant regularly purchased extravagant food items for his own consumption, including steaks, shrimp, lobster and swordfish. On occasion, he has shared these delicacies with Nathan. Upon request, the defendant would provide the plaintiff with an "allowance" of $50.00 to $70.00 per week. The plaintiff was required to sew her own clothes, not for creative expression, but to be able to afford a wardrobe appropriate for her work as a high school teacher.
The defendant's contributions to the family's daily existence have been meager, at best. He has not contributed funds for use to pay the mortgage, taxes, insurance or utilities required to maintain the homestead or the family's automobiles: all of these expenses have been born by the plaintiff. He has not contributed to the funds used for the purchase of the family's groceries or sundries. When the plaintiff is at work, the defendant occasionally places a log upon the fire which is used to heat the home: he does not, however, stack the firewood which is delivered to the house, leaving this chore to the plaintiff and his child. The defendant uses an electric heater in the separate bedroom he occupies. The defendant clears snow from the family's driveway: Nathan, to his credit, mows the lawn. CT Page 1331-M
Approximately five years ago, the defendant began purchasing baseball trading cards, with the expressed intention of using this collection to pay for Nathan's college education. The defendant has sold the majority of these cards, apparently using the proceeds for his own purposes unrelated to the well-being of the family. The defendant also maintained an extensive collection of music CD's, which he used for his own enjoyment.
The plaintiff had started The Bead Basket business in 1974, prior to the marriage. The original object of the business was to manufacture and sell jewelry through craft shows and fairs. During the course of the marriage, the defendant joined the plaintiff in this project. There was uncontroverted testimony that involvement with The Bead Basket was the defendant's only occupation from 1982 through 1995, when he secured the part-time jobs referenced above. There was sparse evidence, however, concerning the defendant's specific contributions to the success of The Bead Basket. He offered no testimony to establish exactly what efforts, if any, he had made to maintain or enhance the business. Indeed, the parties' income tax returns for the past several years show that The Bead Basket has been a losing proposition.
The plaintiff took classes in metal-working and the defendant studied lapidary subjects during the course of the marriage. Over time, the parties had purchased a quantity of stones, including uncut semi-precious gems, and metal products to be used in the business. Neither these items, nor the finished jewelry made or procured by the parties, were either specifically inventoried or insured: the defendant did, however, prepare summary inventories for submission to the Internal Revenue Service at tax time.[3] Both parties have experience in estimating the cost of such jewelry items retail value of jewelry items purchased or produced by the parties for use in their business, based on their experience with The Bead Basket.
The plaintiff described a tupperware container in which approximately $80,000.00 of these jewelry items were kept. The defendant admitted taking the container, and selling some of its contents in New York City to obtain cash. The plaintiff has no present access to the items in the tupperware container, and knows not where the items or the container are located. The defendant maintains a locked room, equipped with showcases, within the marital home. The court infers that the defendant, who had sole access to the marital premises each day during the CT Page 1331-N plaintiff's work hours, has appropriated all of the jewelry items in the tupperware container, and has converted them to his own use.
In recent years, the defendant has pursued several methods of violating the plaintiff's privacy. Without her permission, the defendant has tape-recorded telephone conversations between the plaintiff and her friends. He has opened and appropriated first class mail addressed to the plaintiff. Without her permission, the defendant has signed the plaintiff's name to endorse and cash a series of checks written to her by Blue Cross, in the total amount of $264.24. The court finds that the defendant converted these funds to his own use. The defendant has followed the same procedure to procure the entirety of a tax refund check written to both parties by the Internal Revenue Service, in the amount of $289.00. The court finds that the defendant has converted one half of this amount, or $144.50. Furthermore, the plaintiff had kept a journal during the course of this litigation; she had secreted the journal at her home, but the item is no longer in its keeping place. The court infers that the defendant, who had sole access to the marital premises each day during the plaintiff's work hours, has appropriated the journal, as well, to himself.
The parties intend to sell the marital home. It has been marketed, without success, due in part to the defendant's reluctance to reduce the price of the home to address market conditions.
 II
In reaching its decision, the court has considered all of the requisite statutory criteria, together with the taxable consequences of the financial awards set forth below. The criteria considered include, but are not limited to, those factors specified in General Statutes § 46b-81 as the basis for a decision related to division of the parties' property: the length of the marriage, the causes for the dissolution of the marriage, the age and health of the parties, their station and occupation, amount and sources of income, employability, vocational skills, estate, liabilities, needs and opportunity for future acquisition of capital assets and income. The court has also considered those factors specified in General Statutes § 46b-82 as the basis for an award of alimony in a case such as this: the length of the marriage, the causes for dissolution of CT Page 1331-O the marriage, the parties' age and health, their station and occupation, amount and sources of income, employability, vocational skills, estate, needs, and any award of property pursuant to § 46b-81.
The court has carefully reviewed the principles set forth inO'Neill v. O'Neill, 13 Conn. App. 300, cert. denied, 207 Conn. 806
(1988). O'Neill v. O'Neill held that an equitable distribution of property should take into consideration contributions made to a marriage by a spouse who does not work outside the home, "including homemaking activities and primary caretaking responsibilities." O'Neill v. O'Neill", supra,13 Conn. App. 311. "A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worthand should be evaluated in a property division incident to adissolution of marriage." (Emphasis added.) Id., 311. After review of all the evidence presented, the court finds that the defendant in this case made little or no nonmonetary contributions to the family during the marriage that made it possible for the plaintiff to acquire or retain property. Id., 307. In addition, the court finds that the defendant in this case made little or no nonmonetary contributions to the family during the marriage which had the effect of preserving the value of already acquired property or appreciating the value of already acquired property. Id., 307-308. The evidence presented concerning the defendant's minimal homemaking and primary caretaking efforts have been reviewed above, and have been acknowledged by the court in its orders dividing the parties' property.
The court recognizes, as well, that "[i]n appropriate circumstances in marital dissolution proceedings, a trial court may base its financial awards on the earning capacity rather than the actual earned income of the parties . . . Such circumstances include those where there is evidence that a party voluntarily quit or avoided employment in his or her field of expertise and where there is evidence of that party's previous earnings." (Internal citations omitted; citations omitted.) Paddock v.Paddock, 22 Conn. App. 367, 371 (1990). Where a party voluntarily terminates employment, the court may bases its financial orders on a determination of earning capacity, even if there is no showing that such termination was not wilfully accomplished for CT Page 1331-P the purpose of denying alimony to a deserving spouse. Wilkens v.Wilkens, 10 Conn. App. 576, 580 (1987).
In reaching its decisions concerning custody and support of the minor child, the court again has followed the applicable statutory criteria. It is axiomatic and fundamental that "[t]he paramount concern in ordering custody is the best interests of the child . . . ." (Citations omitted.) Hall v. Hall, 186 Conn. 118,121-122 (1982). General Statutes § 46b-56 (c) requires that [i]n determining whether a child is in need of support and, if in need, the respective abilities of the parents to provide support, the court shall take into consideration all of the factors enumerated in § 46b-84. These factors include: "the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age. health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. General Statutes § 46b-84 (c).
 III
ORDERS
The court is of the opinion that the major cause of the breakdown of the marriage was the defendant's emotional and physical abuse of the plaintiff, as well as the persistent threat of this abuse, throughout their years together. This abuse included the defendant's efforts to control and restrict the plaintiff's daily activities and her efforts at financial independence and maturity. The abuse survived the defendant's ostensibly successful control of his alcohol addition. It culminated in the defendant's repeated invasions of the plaintiff's privacy, and in his unilateral appropriation of marital assets with substantial value.
The court is also of the opinion that throughout the twenty years of their marriage, the defendant failed to demonstrate that degree of industry and ambition which would have enabled him to make effective use of his academic degree and charm to enhance his record of earnings. Rather, the defendant elected not to contribute to the family's financial well-being, albeit with the knowledge that the plaintiff would continue to support him and their son. The court notes that the defendant's current employment has already resulted in a many-fold increase over his CT Page 1331-Q earned income reported for past years. The court concludes that the defendant's education and skills are such that his independent earning capacity far exceeds that which he has already demonstrated. See Paddock v. Paddock, supra, 22 Conn. App. 371;Wilkens v. Wilkens, supra, 10 Conn. App. 580.
Therefore, on the basis of irretrievable breakdown, with fault attributed to the defendant, the court hereby dissolves the marriage of the parties.
The following orders shall enter:
1. CUSTODY.
a. The parties are to have joint legal custody of the minor child, with the plaintiff maintaining the child's primary residence.
b. The defendant will have visitation with the minor child on Wednesday afternoons from 5:00 pm to 7:00 pm, extended to 8:30 pm if no school is scheduled for the following day. Holiday visitations will take place as follows: Thanksgiving — in even numbered years the defendant shall have the child from Wednesday evening preceding Thanksgiving until 6:00 pm on the following Sunday. Christmas — every year the plaintiff shall have the child with her on Christmas eve until 11:00 am of Christmas morning with the defendant having the child for the balance of Christmas day. The child should spend the first half of the Christmas vacation with the plaintiff and the second half with the defendant. Mid-School Vacations — The parties shall alternate care of the minor child for the February and April school vacations; and, in the event there is only one such vacation scheduled for any school year, that too shall be alternated.Summer vacations — Each party shall be entitled to two uninterrupted weeks of summer vacation with the minor child, with each vacation week to commence on a Friday and end on a Sunday.
c. The parties are required to meet Nathan's health care and educational needs with assiduity. The parties will keep and preserve separate logs in which each records: 1) the nature and extent of attention provided to the child by health care and/or educational personnel while Nathan is in his/her care; and 2) the date, time, and dosage of any medication administered to him.
d. The parties will complete the Parenting Education Program, CT Page 1331-R sponsored by the Family Relations Division of the Judicial Department, within one-hundred twenty days from the entry of this decision.
2. CHILD SUPPORT.
a. The defendant shall pay to the plaintiff support in accordance with the child support guidelines. Currently that is 20.5 per cent of his net income as calculated with guideline deductions only. Accordingly, the defendant is ordered to pay the plaintiff weekly child support in the amount of $50.00. A wage execution order shall enter pursuant to General Statutes § 52-362.[4]
b. For income tax purposes, the plaintiff shall be entitled to the dependency exemption for the minor child for 1995 and succeeding years, so long as she remains the primary custodial parent.
3. HEALTH CARE INSURANCE.
a. The plaintiff shall maintain the child as a covered dependent on her job-related health insurance, and shall pay the premium therefore. An order pursuant to General Statutes §46b-84 (d) shall enter. The parties shall each pay one-half of the unreimbursed or uncovered health care expenses for the child.
b. The defendant shall be entitled to remain as a covered dependent under the plaintiff's job-related health insurance for the maximum statutory period under applicable law. The plaintiff will pay the premium for the defendant's health insurance, under her health insurance plan, for a period of eighteen months from the date of this decision. These premium payments shall be in the nature of alimony, and as such shall be taxable to the defendant and deductible by the plaintiff. These payments shall not be modifiable as to term. After expiration of the initial eighteen month period, the defendant shall be responsible for payment of his own premiums for the duration of the COBRA period.
c. The court notes that the defendant has not yet availed himself of such health care services as may be provided to him by the Veteran's Administration. Such benefits as are described in paragraph 3.b. are to be in addition to, and not in lieu of, health care services provided through the Veteran's Administration. CT Page 1331-S
4. ALIMONY.
a. The plaintiff shall pay to the defendant the sum of $100.00 per week in periodic alimony. The period of alimony shall be time-limited to three years, and shall be non-modifiable in amount or duration, except under the following circumstances: 1) if the plaintiff becomes incapacitated and is unable to work at her current occupation; or 2) if the plaintiff is terminated involuntarily from her current position. This award of alimony is deemed by the court to be rehabilitative. The court is convinced that the defendant will be able to earn sufficient income, giving his education and talents, so that after this remedial period has expired, he will be able to support himself and to meet his child support obligations without further assistance from the plaintiff. The payment of alimony shall terminate upon the death of either party, the remarriage of the defendant, or his cohabitation under the terms of Connecticut law.
b. The plaintiff shall provide the defendant with additional time-limited alimony in the way of payment of health care insurance premiums, as described in paragraph 3.b., above.
5. LIFE INSURANCE.
a. The plaintiff shall procure and maintain life insurance in a minimum face amount of $100,000.00, naming the minor child as the beneficiary, until he reaches the age of majority. Upon reasonable request, the plaintiff shall provide verification of the existence of this policy. Nothing herein should be construed to limit the face amount of this policy. Should the plaintiff decide to further secure her child's well being by procuring additional insurance, this order does not preclude such generosity.
b. The plaintiff shall procure and maintain life insurance or post security in an initial minimum face amount of $15,000.00, decreasing over a three year term, naming the defendant as the beneficiary, to protect the alimony due and owing to the defendant. Upon reasonable request, the plaintiff shall provide verification of the existence of this policy.
c. The defendant shall procure and maintain life insurance in a minimum face amount of $20,000.00, naming the minor child as the beneficiary until he reaches the age of majority. Upon CT Page 1331-T reasonable request, the defendant shall provide verification of the existence of this policy. Nothing herein should be construed to limit the face amount of this policy. Should the defendant decide to further secure his child's well being by procuring additional insurance, this order does not preclude such generosity.
6. REAL ESTATE (56 Duane Lane, Burlington).
a. The defendant is to quit the marital premises immediately. The exclusive use of the property is awarded to the plaintiff pending its sale.
b. The parties are to cooperate in achieving a prompt sale of the marital premises. The home is to be sold at a price which fairly reflects contemporary market
c. In view of his extraordinarily limited contributions to the maintenance and support of the marital home, despite his substantial capacity to make such contributions, and in view of his conversion and appropriation of property in which the plaintiff had a measurable interest, the defendant shall receive twenty per cent of the net proceeds from sale of the marital home, after commissions, taxes, closing fees and other expenses of sale have been paid. The plaintiff is to receive eighty per cent of the net proceeds from sale of the marital home.
d. The parties are to share equally in any loss or liability resulting from the sale of the marital premises, including but not limited to capital gains liability.
6. PENSION.
a. In view of his extraordinarily limited contributions to the family weal, despite his substantial capacity to contribute, and in view of his conversion and appropriation of property in which the plaintiff had a measurable interest, the defendant shall receive twenty per cent of the current value of the plaintiff's interest in the State Teacher's Retirement program, which is $14,100.00. This amount is to be paid to the defendant by the plaintiff from the amount she receives after distribution of the proceeds of sale of the marital premises. The plaintiff will receive eighty per cent of the current value of her interest in the State Teacher's Retirement program. CT Page 1331-U
b. In view of his extraordinarily limited contributions to the family weal, despite his substantial capacity to contribute, and in view of his conversion and appropriation of property in which the plaintiff had a measurable interest, the defendant is to receive twenty per cent of the current value of plaintiff's Aetna annuity plan, which is $4,510.00. This amount is to be paid to the defendant by the plaintiff within three years from the date of the entry of these orders. The plaintiff will receive eighty per cent of the current value of her interest in the State Teacher's Retirement program.
7. THE BEAD BASKET
a. The defendant has previously appropriated jewelry items, stones and findings valued at $80,000.00 from the assets attributed to the business known as The Bead Basket. Given the defendant's limited contributions to this family business, despite his substantial capacity to have made greater contributions, and in view of his conversion and appropriation of property in which the plaintiff had a measurable interest, the court finds that the defendant is not entitled to receive any additional distributions from The Bead Basket, nor of property related to this endeavor.
b. The plaintiff is awarded the use of business name, The Bead Basket, and she shall receive all of the remaining and available assets of this entity, including but not limited to inventory, equipment, accounts receivable, and good will.
c. The plaintiff and the defendant will bear, in equal share, responsibility for any debt incurred in the name of, or on behalf of conducting, this business, which debts were incurred prior to the dissolution of the marriage.
8. MARITAL DEBTS.
a. The plaintiff shall pay the Visa debt identified on her financial affidavit, and shall hold the defendant harmless from any obligation incident thereto.
b. The defendant shall pay the debts to Master Card and GMAC as are identified on his financial affidavit, and shall hold the plaintiff harmless from any obligation incident thereto.
c. The parties shall be pay, in equal shares, the debt to the CT Page 1331-V Internal Revenue Service identified on the plaintiff's financial affidavit.
9. AUTOMOBILES.
a. The defendant shall retain the 1993 Chevy pickup, and shall be responsible for all costs incident to such ownership. If necessary, the plaintiff shall cooperate in promptly completing any transfer paperwork required by the Department of Motor Vehicles.
b. The plaintiff shall retain the 1990 Volvo, and shall be responsible for all costs incident to such ownership. If necessary, the defendant shall cooperate in promptly completing any transfer paperwork required by the Department of Motor Vehicles.
10. PERSONAL PROPERTY.
a. The defendant will retain any remaining baseball cards in his collection.
b. The plaintiff will retain all other items listed on Plaintiff's Exhibit A.
c. The defendant is ordered to return to the plaintiff the old Italian 18K jewelry itemized on Plaintiff's Exhibit A.
13. BANK ACCOUNTS.
a. The plaintiff will retain all funds held in, and will retain sole use of, bank accounts identified on her financial affidavit.
b. The plaintiff will assume control over, and will serve as sole trustee for, the account identified as "son's account — Torr SB" listed upon the defendant's financial affidavit, as the court believes this will best serve the interests of the minor child.
12. ATTORNEYS FEES.
In light of the award of property distribution and periodic alimony, no contribution toward attorneys' fees shall be made by either party to the other. CT Page 1331-W
Judgment shall enter in accordance with this Memorandum of Decision.
N. Rubinow, J.